That leaves us to the last argument on the calendar, that's Teamsters vs. Philip Morris International. All right, so Mr. Lieberman, you've got 10 minutes, but you reserved three for rebuttal, so you may proceed now. JEREMY LIEBERMAN Good morning, Your Honors. Jeremy Lieberman, Palmer NLLP, on behalf of Appellants. Your Honor, lead plaintiffs respectfully submit that the district court committed reversible error in dismissing the claims related to the Japanese sales to the four undisclosed studies and the statements regarding GCP compliance. With respect to the Japanese sales, Defendant Kalazopoulos stood on February 8, 2018, and said, discussing the remarkable sales of he sticks, he said he sees nothing on the horizon that would stunt the growth of these sales. No, in the first quarter, correct. He's standing on February 8, 2018, and saying he sees nothing on the horizon that would stop the growth of those that would cause any change to happen from the previous years. And he also said, I don't see this decreasing. That's not what he said. He said, quote, growth in Japan was a result of increasing demand for heat sticks, which we expect to further grow, to further, to grow further in the first quarter. Is this a statement? Yeah, that's what he says. And he says, we have our own projections for total market in Japan, including obviously heat sticks. And there's nothing on the horizon that would cause any change in what happens in the previous years. They're about seven weeks away from the end of the quarter. They're already discussing their January numbers, and they're on the precipice of losing their projections and missing their shipments by 60%. That statement was really in the context of the total Japanese market, not just the heat sticks. But heat sticks are the primary driver of the Japanese market. Cigarettes and heated tobacco. And so growth in Japan was a result of an increasing demand for heat sticks. They're attributing their growth to heat sticks, and they say that we have our own projection for total market in Japan, including, obviously, heat sticks. Everything about- Is there something in the complaint that says that what the total Japanese market for combustible and heat sticks was, that it was smaller in 2018 than it had been in previous years? Well, it had grown at a slower rate, certainly. It had grown in January. It had grown of 16.3%, and then that growth had gone down for the rest of the quarter to 15.8%. So the growth was slowing. The company admits that. But I think you're using the data for just the heat sticks, right? No, for- You're talking about the total Japanese market? I'll check that in a moment, Your Honor. But clearly, the underpinning of all growth is heat sticks. That's what the company is saying in their statements. Don't his comments have to also be read in the context of the 2017 Form 10-K, which came out about a week later? And that had some significant discussion of risk factors, talked about the failure to anticipate changes in consumer preference, exactly the kinds of issues that happened, and you tasked him for not talking about it. Well, they talk about- They say that there may be a change in consumer tastes, but that's a risk factor, something that may occur. But you have on April 19th, you have defending King saying, they already anticipated a plateau in usage of the heat sticks. But it seems to me you really cherry-picked this language. I mean, the question that prompted the answer that you're saying was misleading is, what are you thinking in terms of the combustible cigarette plus heat sticks volume outlook for Japan? So that's both. And the answer is our projection for the total market, including obviously heat sticks, is that there's nothing on the horizon that would change what's happened in the previous years. It's an answer about the total market. And you then, in the complaint, add with regard to heat sticks volume in Japan. It seems to me that you've mischaracterized the statement to make it a more specific and narrow statement. Is that a problem? Well, the company is continually pinning its growth in Japan on heat sticks. There's nothing ambiguous about that. Heat sticks is a small portion of this market, right? In 2017, what proportion of the company's market in Japan is heat sticks? I mean, I'll get you those stats on rebuttal, Your Honor. I'll give you those stats on rebuttal. But clearly the company is saying that their growth was a result of increasing demand for heat sticks. They're saying their growth in Japan is because of heat sticks. And at the same time, they're saying they are anticipating a plateau. I don't have a note on it, but on my recollection, the heat sticks were about 5%. Is that incorrect? 5% of the Japanese market. We'll check that, Your Honor. I don't believe that's the – we'll check it. In any event, with respect to the four undisclosed studies, the company made statements, and I want to focus on the statements with respect to their aerosol, statements that clearly cannot be characterized as opinion, where they say that they – defendants say the studies confirm the ICO's aerosol does not introduce any new or increased risks. They further stated in vitro and vivo assessments of the aerosol revealed reduced toxicity and no new hazards. Are you talking about the undisclosed studies? I'm talking about the four undisclosed studies, yes. Well, the FDA looked at them and approved the product. No, they approved – 30 months later, they approved the product for a reduced exposure. They never give the reduced risk. And that is critically what the company was looking at was, can we say heat sticks has less risk to smokers than tobacco? It's very nice that they approve it for sale, but the whole question for the consumer is, is this more safe? And can we advertise it? Maybe you should be suing the FDA. What's that? Maybe you should be suing the FDA. No, but we're not suing the FDA because the FDA, in the end, did their job. The FDA said you can't call this a reduced risk 30 months later. And that's something we can't – just like there's no fraud by hindsight, there's no exculpation by hindsight. The company can't point to 30 months later, they may have given more data to the FDA, there may have been further discussions and say, oh, well, the FDA basically gave them a half a loaf, but somehow we're exculpated from fraud. There were four studies, never disclosed to investors, which showed higher carcinogens, four carcinogens that were not – that were much more elevated levels, eight toxicants that cause genotoxic concerns, and none of those are disclosed to investors, and they come in at serious amounts. And ultimately, the FDA points to those carcinogens and those chemicals as reasons for not giving the MRTPA. Right, but, I mean, so there's four carcinogens, right? Yes. And all four of those are present, but they're still lower than cigarettes, right? No, no, Your Honor, no. They're at higher levels than cigarette smoke. I'll get you the exact data. But no, the four carcinogens, the eight toxicants, are higher at higher levels. And so the glycidol is 3.2 – 320 percent higher. The furfural is 1.6 times higher. It's 160 percent. These are all higher, and the 39 percent of the 80 compounds were – there were 80 compounds that were found in a higher rate than combustible cigarettes, and of those 80 compounds, 39 percent of them were hazardous. And so you have the genotoxic concerns. Similarly, we're also at much higher levels. You have glycidol is at 205 percent, propylene glycol is 383 percent, all that higher than what you have in combustible cigarettes. And that's exactly why the FDA never gave – I just want to get back to this. So new hazardous chemical compounds, right, it's no new hazards, it's hazards that are not in cigarette smoke, right? Mm-hmm. So the four that you mentioned are in cigarette smoke as well, aren't they? They are in cigarette smoke, but they are at – They're not new, in other words. These are not new hazards. These are the same hazards as cigarettes. Sure, but they're much – they're much higher – they're much higher levels than heat sticks. That's the problem. But the no new hazards statement is not a no higher hazard. It's no new hazard. Oh, but that – The falsity is that it's not – that these are new. The falsity is that when you say it's a hazard to have a much higher level of carcinogens than a combustible cigarette, that causes a hazard. When they say Iqos vapor contains an average 90, 95 percent lower levels of toxicants, they're saying they're all toxicants, but yet there are eight toxicants that are at significantly higher levels. The district court itself found these statements appeared at first blush to be false, but said, well, the FDA later on went ahead and approved this, so it can't be that it was unreasonable to make that statement. That's not how you judge falsity. You judge falsity out of the statement at the time it's made. At the time these statements were made, there were high levels of these four carcinogens and high levels of these eight genotoxic concerns. And that was never disclosed by defendants at any time, and it was not disclosed ultimately until right before the TPSAC meeting. They sent it to the FDA, and it was finally published two weeks or a week and a half before the advisory committee meeting. Ultimately, at the time that the MRTPA is granted, they get a reduced exposure, but they don't get the reduced risk or reduced harm because of the fact of these four undisclosed studies. All that is – and the 30-month delay is something billions – I just want to get back to something you said. Sure. So, reduced toxicity and no new hazards. So, you're saying that new hazards includes both hazards that are not contained in cigarette smoke, so therefore new, but also hazards that are in cigarette smoke, but that might be higher for the smokers. Well, it's a statement in context. Reduced toxicity – obviously, you don't have reduced toxicity with respect to these 80 compounds and with respect to the four carcinogens and eight toxicants. And then no new hazards. We would say it's a hazard to have when you have a higher level of carcinogens and toxicants. But then you have further statements where you say that – the company says IQOS aerosol does not introduce any new or increased risk compared to tobacco smoke. They're making that statement based upon the aerosol studies, and yet you have these four carcinogens and you have these eight toxicants. And so the company is making statements – detailed statements, metrics regarding their aerosol studies. Aerosol studies, not statements of opinion, not about whether they may get an FDA approval, and they're not disclosing these particular chemicals. All right. You've reserved three minutes for rebuttal. So, we'll now hear from Mr. McDonough. Good morning, Your Honors. May it please the Court, Kevin McDonough on behalf of the defendants at police. This case was properly dismissed. As the district court correctly held, the complaint fails to satisfy the PSLRA's stringent pleading requirements for both Falsity and Cienter. This court, of course, can affirm on either – Are they stringent pleading requirements for Falsity? Yes, Your Honor. I thought it was stringent pleading requirements for Cienter, but we haven't really talked about Cienter yet. Do you want to go there? Do you want to leave there? What do you think is stronger, no Falsity or no Cienter? I think Cienter is an easy pathway to affirming the district court in this case, but I think our Falsity arguments are equally strong. Which one do you think is the best? Go with your best. Cienter is certainly the best, and I'll cover that briefly, Your Honor. I do want to respond to some of Mr. Lieberman's points. But looking at the overall inferences to be drawn from the complaint, I think it's highly noteworthy that the traditional hallmarks of Cienter are simply not present here. We have no confidential witnesses who had any meaningful contact with the individual defendants during the class period. We have no allegations that any defendant was in possession of documents or information that contradicted his or her statements at the time the statements were made. We have no suspiciously timed executive terminations or resignations that coincided with the events in question. And we have no suspicious or unusual stock sales by the individual defendants. In fact, for the vast bulk of the individual defendants, we have no stock sales at all. For the CEO, we have two stock sales that occurred as part of a long-term pattern in which he made one sale every February for five straight years. His sales represent a very small proportion of his overall holdings, and his holdings increased over the course of the class period. So under a number of Second Circuit cases, which we cite in our briefing, there's simply not a credible theory of motive here. And that becomes very important to the overall Cienter analysis because, as the Court has recognized, where there are insufficient allegations of motive, the recklessness allegations to support a strong inference of Cienter must be, quote, correspondingly greater, and we simply don't have correspondingly greater allegations of recklessness for the reasons that I mentioned. And when you view the case as a whole, we submit that the non-fraudulent inference is far more compelling, and that's what the District Court found. You've got a situation where the defendants disclosed all of their scientific studies, the methodologies and the results, and it's simply not true that the four studies were not disclosed. The complaint says they were disclosed. The reply brief at page 21 that the plaintiff submitted acknowledges that the studies were disclosed. They take issue with the timing of disclosure, but it's a settled fact in the case that the studies were disclosed, the results fully to the FDA and by extension to the public. Importantly, on falsity and Cienter, the FDA, which is the authority on the proper interpretation of the scientific data here, performed an extensive scientific review. They issued an 80-page document in which the FDA largely validated the interpretations that Philip Morris had made during the class period based on the results of the scientific studies. As I said, the defendants maintained large holdings of company stock throughout the class period and in some cases increased their holdings. And I think it's worth noting as well as much fire has been thrown at the company for what occurred in Japan, the company disclosed slowing growth of the devices in Japan, not the heat sticks, the devices in Japan, long before that was perceptible in the company's financial results. So in April of 2018, the CFO, Mr. King, said, he said to the market, you won't see this in our results for the first quarter, but I am flagging for you that the growth in the sales of our devices is not as we expected, and we're letting you know that because it might have. He didn't say it has. It might have an impact on the sales of our heat sticks later in the year because the heat sticks are a lagging indicator compared to the sales of the devices. So adding up all those points, I think the non-fraudulent inference is quite compelling and much stronger than the fraudulent inference. I will say, Your Honors, on the four aerosol studies, I think really the issue sort of begins and ends with what the FDA said. When they looked at the four studies, respectfully to my colleague, the FDA did not say we are declining reduced risk because of the four aerosol studies. One can search the 80-page scientific review in vain and not find that statement. What the FDA actually found, and this is a quote from the scientific review. It's in the joint appendix at page 2976, specifically in reference to the four aerosol studies. Although some chemicals of potential concern, not on the FDA's list, may be higher in IQOS users, the increase in these constituents does not impact, does not impact, the conclusion that the substantial reductions in HPHCs, harmful and potentially harmful chemicals, and findings from the toxicological evidence are reasonably likely to translate to lower risk of tobacco-related morbidity and mortality. So Mr. Lieberman has several times said, yeah, but you can't rely on later findings or later developments to sort of establish the truth of statements that were made previously. What's the response to that? Yeah, two points on that, Your Honor. So this court has held in a number of occasions that what the FDA ultimately finds is highly relevant to a case that's based on an FDA application. And the court has done that before. So in the Sanofi decision, for example, the court pointed out that the product ultimately was accepted by the FDA. And so criticisms about the company's interpretations of its data have no merit. And that's the situation here. So our position is not that these statements were false and they later became true. Our position is the company's statements were interpretations of scientific data. And so the question is under Sanofi and Kleinman and, frankly, Omnicare, are those interpretations reasonable? Are they rational? Are they based on a body of evidence? And here we have the FDA looking at the same evidence and reaching an interpretation that is consistent with what the company has said. So by definition, the company's interpretations we submit were rational and reasonable, and that's squarely within Sanofi, Kleinman, and, although a different context, Omnicare. But what's critical, I think, to note about the application process with the FDA is that the agency, in order to issue an exposure modification order, which is what was issued for the IQOS product, in order to reach that determination, the FDA had to find that there was a reasonable likelihood that the risk of tobacco-related diseases would go down from using this product compared to cigarettes. That's what the company was out telling investors. They said, we think this product has the potential to reduce the risk of harm compared to cigarettes. Philip Morris did not say, yes, in fact, this product reduces the risk of harm. They did not predict regulatory approval. To the contrary, they made numerous warnings to investors that the company could not predict the outcome of the regulatory process, which is well understood by reasonable investors. And here, this is the first time the FDA in its history issued an exposure modification order for an electronic nicotine product. This was chartering new waters here, and the company was careful in its statements about that. But ultimately, for the FDA to agree with the company's interpretations based on the same data really eliminates the theory related to the IQOS statements. And that's true, Your Honors, also with respect to criticisms of the company's statements that it was in compliance. Let's get to Japan. Are you getting to Japan? Yes, Your Honor. On Japan, as Your Honors pointed out, the actual words that were used by the CEO are different than how they're portrayed by the plaintiffs. The CEO was answering a question about secular trends, long-term trends in the total Japan market for tobacco. And he answered the question at that level. You said secular trend? Yes. The question, literally, Your Honor, is, is there anything changing from a secular perspective? And in the questions leading up to that question and answer between the analyst and the CEO, there's a discussion about what's happening in the overall Japan market. What's the long-term outlook for tobacco products in general, not for reduced risk products or the IQOS product in particular? And the CEO gave an overall answer to that question, which is that he did not see anything in the horizon. Counsel, you've got two counsel at the table. We're not running back and forth with notes here, okay? Go ahead. That the CEO did not see anything in the horizon changing from a secular perspective compared to the previous years. So there are multiple problems with the challenge to that statement, and I'll cover them briefly because I see that I'm out of time. The first is that it's a forward-looking statement, as the district court found. There's a lot of ink spilled on that in the briefing. We think it's clear that that's a forward-looking statement, and the plaintiffs have not overcome the test for the safe harbor. But even beyond that, if the court had any struggle with that, there is no allegation of fact in the complaint that anything changed in 2018 compared to the previous years, which is what the CEO said. Whether you look at that from the overall tobacco market, which is what he was addressing, the market for heat sticks, which is the way the plaintiffs are interpreting it, either way there is no allegation that something changed compared to previous years. The IQOS product continued to grow. Sales of heat sticks continue to grow, and there's no debate about that between the parties. If there are no questions further, Your Honor, I'll conclude my remarks simply by saying we respectfully request that the court affirm the district court's dismissal of the case with Prentice. Thank you. All right, thank you. Okay, Mr. Lieberman, you have three minutes. Thank you. Your Honor, to address the point with respect to the four studies, it's important to note that in June 2020 when the approval was granted for the reduced exposure designation, the FDA specifically noted there is no direct clinical or epidemiological evidence of risk reduction. And so the FDA is saying is that at the end of the day you haven't proven with any direct evidence that there's a reduced risk. And so that's a conclusion made after all the 30 months that the court noted below. That's a conclusion made after reviewing the four studies, the four undisclosed studies, that simply you haven't proven in your case that there's a reduced risk. The plaintiffs here and investors did not know at the time they made their investment that there were four studies actually showing increased carcinogens and increased components of toxicological concern. With respect to the GCP violations, the complaint alleges that based upon confidential informants and a Reuters article that there were a number of irregularities in the studies. There was the urine samples of the Polish individuals, the Polish members of the study, who had 12 to 18 liters of urine when the average amount of urine is two to four liters. You had this scenario where the Japanese urine samples were all combined. And that combination- Are you going to address Sienta at all? Sure. With respect to- That's an independent basis that Judge Abrams relied on, right? Absolutely, Your Honor. And so with respect to the Japanese statements, the Sienta, we believe, is a CEO of stock sales, 49,000 shares for $5 million. That was his largest stock sale made right after the- His largest stock sale- In his history as a CEO. But his holdings in the companies went up, right? They increased, but we think looking at- That's not relevant? That may be relevant, Your Honor, but certainly as far as evidence of Sienta, we think it does draw some inference of Sienta here. We have a stock sale right after full statements are made for 49,000 shares, $5 million. This is the largest stock sale in history. And so we think that does lead to an inference of Sienta. With respect to the Japanese sales, Defendant King says we anticipated this plateau. We knew about it. He says there was a plateau where younger users were going to use heat sticks in lower numbers, and he says this is something that we anticipated. We just thought it was going to happen later in the year. Well, that was never told to investors. So this is information Defendant King knew, but simply investors did not know as they're making their statements touting the growth in heat sticks during the class period. With respect to the four undisclosed studies, we think that the transfer of those studies, submission of those studies 11 to 18 months after they were actually made, right before the TPSAC meeting, also shows an inference of Sienta. We think that's highly suspicious. But an inference that they had the information and that they knew that it was false? They had the information and they knew that it cut the other way and did not disclose it to investors. And you have Defendant- What is the evidence or what are the facts alleged that support that they had the information? This is the most important application to the company during the class period. These were- They must have known. They must have known. The CEO specifically discussed the aerosol studies, specifically discussed how they're available immediately, and yet somehow these four undisclosed studies showing adverse results were never disclosed. And you have the defendant speaking knowledgeably about a reduced risk designation, about how there's evidence of reduced risk, and yet there's here evidence cutting the other way, yet it is never disclosed to investors. And we think those are clearly inferences of Sienta. Thank you. So I think we've gotten your briefs and we appreciate the argument. We will reserve decision. That concludes the argument calendar. We have two others on submission that we will also reserve decision on. So let me ask the deputy if she would adjourn court. Thank you. Court is adjourned.